**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**TACOMA DIVISION**

| | |
|---|---|
| **W.B., a minor, by and through his parents WILLIAM BURROWS and CASSANDRA BURROWS, Individually and On Behalf of All Others Similarly Situated,** | **Case No.:** 3:22-cv-05281 |
| **Plaintiff,** | **COMPLAINT—CLASS ACTION** |
| **v.** | **JURY DEMAND** |
| **WARGAMING GROUP LIMITED a/k/a WARGAMING.NET,** | |
| **Defendant.** | |

### INTRODUCTION

The plaintiff W.B. ("Plaintiff" or "W.B."), a minor, by and through his parents Cassandra Burrows and William Burrows, including pursuant to Federal Rules of Civil Procedure 17(c)(1)(A) as general guardians, brings this class action complaint, individually and on behalf of all others similarly situated against the defendant Wargaming Group Limited a/k/a Wargaming.Net (the "Defendant" or "WGL"), to enjoin Wargaming's operation of illegal online gambling and to recover damages. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief, including investigation conducted by his guardians and attorneys, as to all other matters.

1.     Defendant owns and operates a video game development company in the so-called "casual games" industry—that is, computer games designed to appeal to a mass audience of casual games. Amongst the games, Defendant owns and operates is a popular online war game under the name World of Warships.

2.     On Defendant's website, Wargaming.net, Defendant offers a multitude of electronic versions of different war games to consumers. These include the subject game, World of Warhips. The games are available for download on Wargaming.Net and are also available on Android, Apple iOS, Windows, XBOX, and PlayStation consoles.

3.     As part of their business model, Defendants allow consumers to purchase in-game items within the World of Warships game. For example, Defendant allows consumer to purchase premium in-game currencies, including "Doubloons." Doubloons and other in-game currencies can be purchased within the game itself or through Defendant's website. Doubloons allow players to purchase resources and other items.

4.     Defendant's business model also allows players to use Doubloons or real-world currency to purchase crates, containers, or boxes. These are often referred to as "loot crates," "loot boxes," or similar names. These loot crates provide players with *a chance* to obtain alluring items, such as rare warships, premium items, or rewards which help a player advance in the game. These coveted and alluring items tend to be rare, such as a premium ship that would otherwise be expensive to purchase outright or otherwise difficult or impossible to obtain. Plaintiff is informed, believes, and thereon alleges that, Defendants purposefully manipulate the in-game economy in order to incentivize the purchase of loot crates.

5.     However, purchasing a loot crate does not automatically allow players to obtain the coveted items. Rather, the player "rolls the dice" each time they purchase and open a loot crate. The process is designed to be exciting, as a player watches a virtual mechanical arm lift a crate. As it opens the crate, sparks fly and various sound effects occur, much like the fanfare someone might encounter each time they pull the lever at a slot machine. As with a slot machine, often players do not receive

the items they wanted and are incentivized to continue purchasing loot crates with the hope that the next one will have the reward they desire.

6. The likelihood of obtaining such coveted items within a loot crate is based on a formula known only to Defendant. During most, if not all, times relevant to this complaint, Defendant did not provide users with the likelihood of obtaining coveted items (referred to as the "drop rate) and instead required its users to hope for a chance (ie: gamble) that the next loot crate will be the lucky one.

7. What is known, however, is that advancement in the game requires, in significant part, on the player's collection of resources which can be obtained by playing or through premium purchases, such as loot crates. Should a player choose to earn the resources by playing, they're met with months, if not years, of frustration till the requisite resources are obtained. On the other hand, this process can be expedited significantly through loot crates.

8. Thus, by wagering real-world currency, players can obtain loot crates, loot boxes, loot containers, or similar options for a randomized selection of rewards, which contain *a chance* of potentially obtaining highly useful or desirable items. In order to further incentivize the purchase of these loot crates, these items may otherwise be unavailable, expensive, or require a significant time investment to obtain.

9. By operating its online games of chance, Defendant has violated Washington law and illegally profited from tens of thousands of consumers under the age of 18. Accordingly, Plaintiff, through his Guardians Ad Litem, on behalf of himself and a Class of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs and attorney's fees, and to enjoin Defendant from its illegal conduct.

10. Upon information and belief, Wargaming America Inc. is the publishing arm of Wargaming.net (one of the websites of Defendant), providing marketing, public relations, business development, community and customer support for its gaming titles.

**PARTIES**

11. William Burrows ("Mr. Burrows"), an adult, is one of Plaintiff's parents and general guardians. Mr. Burrows is resident of the State of Washington.

12. Cassandra Burrows ("Mrs. Burrows"), an adult, is also one of Plaintiff's parents and general guardians. Mrs. Burrows is resident of the State of Washington.

13. W.B. is a minor under the age of 18, and is a natural person and citizen of the State of Washington. W.B. resides with Mr. and Mrs. Burrows.

14. Defendant Wargaming Group Limited is a foreign global video game company headquartered at 105, Agion Omologiton Avenue, Nicosia 1080, Cyprus.

15. Upon information and belief, Defendant has offices within the United States of America, such as in Austin Texas, and Chicago Illinois.

16. Upon information and belief, Defendant has employees within the Unites States of America, and advertises through Wargaming America Inc. for job openings at several offices, including in Austin, Texas; Baltimore, Maryland; Chicago, Illinois; and Seattle, Washington.

17. According to Defendant's website, it maintains a mailing address at 500 108th Ave NE, Suite 2350, Bellevue WA 98004-5582.

JURISDICTION AND VENUE

18. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the Class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests, and costs, and (c) none of the exceptions thunder that subsection apply to this action.

19. This Court has personal jurisdiction over Defendant because Defendant conducts significant business transactions in this District, in the County of Clark, State of Washington, and Plaintiff was injured in Clark County where Plaintiff resides.

20. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, where Plaintiff resides.

GENERAL FACTUAL ALLEGATIONS

21. Video game developers have begun to recognize the lucrative nature of so-called "free-to-play" online games that are based on an in-app purchase model.

22. In 2018, war games similar to the Defendant's surpassed $2.8 billion in revenue within five

years of existence.[1]

23.    As explained by videogame magazine, PC Gamer:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some . . . the allure of a closed box full of goodies it too powerful to resist. Whatever the worth of the randomized [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[2]

24.    Game Informer, another videogame magazine, has opined:

> "[M]any new mobile and social titles target small, susceptible populations for large percentage of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[3]

25.    Massively Overpowered, another videogame magazine, has opined:

> "As a free-to-play naval arcade, World of Warships has continually sought to maximize profit, even at the expense of the well-being of its own players, and studio Wargaming has now begun to push away some of its most ardent defenders and contributors with its **aggressive gambling mechanics**. (emphasis added)[4]

---

[1]   SensorTower—Game of War Revenue Has Surpassed $2.8 Billion in Five Years, https://sensortower.com/blog/game-of-war-revenue (last visited Mar. 24, 2022).

[2] PC Gamer, Microtransactions: the good, the bad and the ugly, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Mar. 24, 2022).

[3]   Game Informer, How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-forgaming.aspx?CommentPosted=true&PageIndex=3 (last visited April 5, 2018)

[4] The Soapbox: World of Warships' aggressive monetization incited a mass-exodus of content

Unfortunately, at some point along the way, **marketing blurred with psychological exploitation**. (emphasis added)[4]

It's worth pointing out… that **World of Warships markets its game to young kids** as well as adults. **The terms of service stipulate players must be at least 13 years old to play, which means that these mechanics are being introduced to children who are too young to legally drive**. The Pan European Gaming Information (PEGI) rating is 7, meaning that the game is appropriate for children aged 7 and older. (emphasis added)"[4]

26. The Gamer, another videogame magazine, has said:

"Studies analyzing the behavior of gamers who buy loot boxes conclude that there is "**robust evidence**" that the **microtransactions are "structurally and psychologically akin to gambling**." In a compilation of 13 reports all but one of them found this link, which also suggests that a third of those spending the most on loot boxes are classed as "**problem gamblers**." (emphasis added)"[5]

27. As described below, Defendant's various online war games have thrived, and tens of thousands of consumers in the State of Washington have spent millions of dollars unwittingly playing Defendant's unlawful games of chance.

**A Brief Introduction to Defendants' Online Games**

28. World of Warships is a "free-to-play" online naval warfare game which was launched on September 17, 2015. It allows its users, who range from casual gamers to military enthusiasts, to have a chance at commanding legendary warships in a team-based platform. Those with better ships or superior perks often have a leg up, not only over the competition, but against their own teammates as well. By doing well in the game, a player can earn advantageous ships or resources to be used within the game's economy. However, especially in a team-based format, where you are reliant on the cooperation and capability of your teammates, it can often be difficult to progress under the "free-to-play" moniker and players are pressured, if not forced, to purchase premium items, including loot crates, to continue or progress.

---

creators, https://massivelyop.com/2021/08/16/the-soapbox-world-of-warships-aggressive-monetization-incited-a-mass-exodus-of-content-creators/#
[5] https://www.thegamer.com/study-links-loot-boxes-gambling/

29.     The game's in-game economy is micromanaged by Defendant's engineers. Through the designing and modification of the game's codes and rules, Defendant has created robust environment which incentivizes premium purchases, including the purchase of loot crates. For example, the game is set up such that, after each gaming session, the players ship undergoes a "virtual maintenance" that costs in-game currency. If a player lacks the sufficient resources to maintain their ship, it will become unavailable for use.

30.     Obviously, the ships are virtual and there is no actual maintenance occurring. Instead, the game's engineers designed it in such a manner to force players to maintain resources and incentivize the purchase of premium items, such as loot crates, in a game otherwise advertised as "free-to-play."

31.     Similarly, the in-game economy offers players the opportunities to purchase loot crates, which provide the player *a chance* at obtaining a high-value items. The game's engineers often coordinate the sale of loot crates with events such as Christmas or New Years. When Defendant hosts such events, the entire in-game user interface is changed to reflect the availability of new premium items, such as loot crates. As previously explained, these loot crates are advertised to contain rare ships, hard-to-obtain in-game resources, or collectibles necessary to advance in the game. In return, and despite the fact that there is no guarantee that the user receives the coveted items, the loot crates command a premium price. Plaintiff is informed, believes, and alleges that Defendants profit handsomely from the sale of loot crates, including the sale of such items to persons under the age of eighteen.

32.     Plaintiff is informed, believes, and thereon alleges that World of Warships is one of many war games owned and operated under a parent company referred to as "War Gaming."

33.     Since the launch of Word of Warships, Defendant has been actively developing new games for its online free-to-play games such as World of Tanks, World of Warplanes, World of Tanks Blitz, World of Warships Blitz, and Master of Orion.

34.     Consumers can play Defendant's online war games by downloading the games directly from Defendant's website on Wargaming.net, or on Apple iOS, Android, XBOX, or PlayStation.

35.     Defendant has made huge profits through their online "free-to-play" games. According to

Bloomberg Billionaires Index, WGL is valued at $1.5 billion.[6]

36.    Defendant's CEO and founder, Victor Kislyi, has a net worth of $1 billion, and Kislyi controls 64% of the business directly.[7]

37.    In 2014, Defendant claimed over 100 million registered users of its online games.  More recently, according to Bloomberg, Wargaming now has a network of 150 million users across the globe.[8]

38.    "Wargaming is one of the industry's most successful creators of free-to-play online games, which produce revenue through premium accounts offering players more credits that enable them to move faster through increasingly difficult levels of play."[9]

39.    However, as explained further below, the large revenue that Defendant receives from its war games is the result of operating unlawful games of chance disguised as innocuous online videogames.

**DEFENDANT'S ONLINE GAMES CONTAINS UNLAWFUL GAMES OF CHANCE**

40.    Plaintiff is informed, believes, and thereon alleges that Defendant's game, World of Warships, operates in much the same manner as a casino. Players are offered free "entry" and allowed to download the game for no cost. The game is marketed as "free-to-play," besides being engineered to lure a player into spending money once they begin to play. In fact, Defendant will offer incentives, such as in-game currency, for new players to begin playing the game.

41.    Once players begin playing, they are met with a barrage of stimuli inducing sounds and visuals designed to entice and focus the player's attention, time, and money. The initial stages of the game are designed to be easier. Players can advance with relative ease and without making in-game purchases – though such purchases are nonetheless available to them. As the player invests time and progresses, the game becomes increasingly difficult. However, it is important to note, the

---

[6]    Gold    News—Bloomberg    Values    Wargaming    at    $1.5    Billion, https://www.goldnews.com.cy/en/companies/bloomberg-values-wargaming-at-$1.5-billion.
[7] GameSpot—Gaming Has a New Billionaire, https://www.gamespot.com/articles/gaming-has-a-new-billionaire/1100-6435097/.
[8] *Id.*
[9]    Gold    News—Bloomberg    Values    Wargaming    at    $1.5    Billion, https://www.goldnews.com.cy/en/companies/bloomberg-values-wargaming-at-$1.5-billion.

game does not just become more difficult in skill. It's engineered in-game economy also begins to become more costly.

42.    For example, the amount of credits it costs to virtually maintain a Tier II ship would be a pittance compared to the amount it would cost to virtually maintain a Tier VIII ship. Similarly, the cost of purchasing a Tier II ship with in-game currency is significantly cheaper than the cost of purchasing a Tier VIII ship. Moreover, as the player progresses, the game becomes more sophisticated and competitive, thus inducing players to begin paying in order to simply keep up.

43.    Part of this involves the purchase of loot crates. Loot crates are often introduced into the game with significant fanfare. The user interface of the game is changed to reflect the theme of the crates. Defendant releases videos on YouTube and other platforms discussing the potential benefits of loot crates, which include obtaining rare ships or resources. Such items are coveted, as they benefit the player and allow them to progress in the ever-more-competitive upper tiers and play the game without the disruption of low-resources or low-in-game currency.

44.    As previously indicated, loot crates can command a premium. For example, twenty-five "Always Courageous Premium Containers" cost up to $125.00 USD. *See e.g. Figure 3(b) below.* However, and despite their cost, they provide no guarantee that the most coveted items will be acquired. Instead, players, including those under the age of 18, must take a <u>*chance*</u> that the loot crate will have the items they desire.

45.    Further, as of the time of drafting this complaint, World of Warships maintained a "PEGI 7" rating. According to PEGI's website, the organization provides age rating that are designed to "ensure that entertainment content, such as games…. Is clearly labelled with a minimum age recommendation based on the content they have." According to PEGI's website, a PEGI 7 rating means:

> Game content with scenes or sounds that can possibly be frightening to ***younger children*** should fall in this category. (emphasis added)[10]

---

[10] https://pegi.info/search-pegi?q=world+of+warships&op=Search&age%5B%5D=&descriptor%5B%5D=&publisher=&platform%5B%5D=&release_year%5B%5D=&page=1&form_build_id=form-VNNo09HD0ihzZ1LA4_6RvpPRMWtdyCmo3nyjwbkU3gY&form_id=pegi_search_form

46.    For comparison, the online game, SpongeBob SquarePants: Battle for Bikini Bottom –
Rehydrated – a game clearly directed at children – also has a rating of PEGI 7.  Plaintiff is informed
and believes that, since the World of Warships community has become disgruntled with the game's
monetization practices, that Defendant may be applying for a higher PEGI rating.

47.    Consumers who visit the Defendant's online website for the first time are allowed to
download certain online games, such as World of Tanks, World of Warplanes, World of Warships,
and Master of Orion.

48.    Consumers are first required to create an account in order to begin playing the games. One
of the objective of the game is for consumers to collect their favorite virtual warships. To collect
the warships, consumers need to fight in many battles to gain experience ("exp.") and credits to
research and purchase one's favorite warships.

49.    Credits may be used to purchase warships, consumables, and camouflages within the
premium shop. *See e.g.* Figure 1.



(Figure 1.)

50.    When consumers begin playing, they are able to earn exp., credits, and other items to
continue advancing to more difficult levels within the game. However, this process is difficult,
time consuming, and at times, frustrating. It can take up to months and is referred to as "grinding,"
the process by which the game is played ad nauseum for the purpose of obtaining the requisite
resources to advance. However, many players cannot dedicate the necessary time or simply do not

have the requisite skill to advance in the game and, but for premium items, such as loot crates, would be stuck. This is especially frustrating if the player has already made some initial progress, which the game is designed to provide. In order to advance or continue, many players resort to buying credits, Doubloons, or other forms of in-game currency within the premium shop. This same process is leveraged through the use of loot crates. For a fee, players are allowed *a chance* at obtaining the unattainable. Rare ships, valuable in-game resources, or collectibles that will expedite their progress.

51.     Doubloons are the Premium currency within World of Warships. They can be converted into several other in-game currencies, making them valuable. They can also be used to purchased items such as consumable upgrades which expire after each game.

52.     At times, consumers have been able to use $20 World of Warships gift cards redeemable for 5,000 Doubloons, which equates to 250 Doubloons per 1 U.S. Dollar.  As of March 28, 2022, a consumer could purchase, for example, 7,500 Doubloons for $29.70 U.S. Dollars, or 12,500 Doubloons for $49.50 U.S. Dollars, which equates to approximately 252 Doubloons per 1 U.S. Dollar.

53.     One user on forum.worldofwarships.asia, LightDarkMaster, stated: "…[I] have to put priority to my studies as I am a student. Lately, it's getting harder and harder to earn credits to purchase high tier ships. What should I do to earn more credits without being premium? Please help!"[11]

54.     Players cannot advance to more difficult levels without having certain ships or upgrades. In order to obtain them, users must have the requisite credits, experience, or other in-game currencies and resources. However, as previously specified, the "grinding" process is time consuming and many players will have difficulty dedicating the requisite time. Plaintiff is informed, believes, and thereon alleges, that the "grind" is incorporated by purpose in order to incentivize the purchase of premium items, such as loot crates.

55.     The decision to sell Doubloons, loot crates, and other such premium items to paying

---

[11] World of Warships Game Forum—Asia--https://forum.worldofwarships.asia/topic/18176-need-tips-for-earning-credits/ (last visited Mar. 24, 2022).

consumers is not an accident. Rather, by converting real dollars into various in-game currencies and items, Defendant attempts to lower the perceived cost of these items while maximizing the value of the awards received (i.e., advancing further in the game or receiving items that non-paying players would not otherwise receive), further inducing consumers to purchase items, such as loot crates, and bet on obtaining valuable items in return.

56.     As seen in Figure 1, players in their own personal accounts are able to purchase credits or exp. for their own personal benefit.  Once players run out of their exp. or do not earn enough credit to continue due to the lack of being able to play for lack of resources they cannot continue to advance in the game without purchasing Doubloons or other premium items. *See e.g.* Figure 2 and Figure 3.

57.     As seen in Figure 1, players in their own personal accounts are able to purchase items and resources from the "Premium Shop." In particular, players can purchase credits or Doubloons, which can be converted into experience or other in-game resources. When a player runs out of credits or have not earned enough experience, they cannot advance in the game without purchasing Doubloons or other premium items. *See e.g. Figure 2(a), 2(b), 3(a), and 3(b)*.



**(Figure 2(a).)**



**(Figure 2(b).)**



**Figure 3(a).)**



**(Figure 3(b).)**

58. Players are able to purchase credits (in-game currency) through various mediums such as PayPal, credit or debit cards, gift cards, and other payments. *See e.g.* Figure 4.



**(Figure 4.)**

59. Should consumers continue to play the game without purchasing credits or exp. they can earn exp. slowly, depending on whether a player wins his/her game with other players and how much damage is done to another's ship.

60.     Although Defendant markets its war games a free-to-play game, Defendant offers loot crates in order to incentivize players to purchase these such crates to try and obtain rare ships that would otherwise be expensive to purchase outright, if at all.

61.     These loot crates contain an array of cosmetics for the game and opportunities to obtain, for example, a warship that is otherwise available for purchase at a premium price. Whereas a warship may cost over $50.00 in the premium shop, a loot crate can often instead be purchased for one-fifth that price for *a chance* to obtain it. Some of these loot crates, however, were *required* in order to obtain rare ships. Thus, at times, some players were not able to purchase a particular premium ship – especially the most coveted ones – without first purchasing loot crates.

62.     This is done to incentivize the purchase of Loot crates. Loot crates could only be paid for with actual money or Premium in-game currency such as Doubloons, which are purchased with actual money.[12]

63.     Former members of Wargaming's official Community Contributor program have left the game, as one content player made it clear that he was leaving due to "increasingly aggressive monetization and implementation of gambling mechanics[.]"[13]  This was because the loot boxes were risky, expensive, and did not ensure that gamers were going to obtain the coveted items they desired.

64.     It was not until August of 2021 that Wargaming's official response was to provide an "alternative way to purchase" ships instead of players betting on purchasing loot boxes and potentially winning an opportunity to buy a warship.[14]  *See e.g.* Figure 3 (the USS Florida is now available for purchase for $39.20).

---

[12] The Gamer—World of Warships Content Creators Are Jumping Ship as Game Leans Heavily Into Loot Box Mechanics, Sean Murray https://www.thegamer.com/world-of-warships-loot-boxes/ (last visited Mar. 24, 2022).
[13] *Id.*
[14] World of Warships—America, Developers apology regarding contributors who left due to random bundles. https://forum.worldofwarships.com/topic/243138-on-the-cctpmissouri/ (last visited Mar. 24, 2022).

65.     On February 8, 2021, Plaintiff redeemed his $25 gift card from GameStop (card ending 9551) to purchase 5,106 Doubloons in Premium online currency for World of Warships.

66.     That same day, Plaintiff also purchase 5,106 Doubloons for World of Warships using a Visa gift card ending 1532, costing him $17.02 U.S. Dollars.

67.     Using the Doubloons purchased through the Defendant's online Wargaming Premium Shop, Plaintiff then purchase approximately two loot crates for World of Warships.

68.     After Plaintiff purchased the loot creates and opened them online, it gave him a *chance* to win desirable Premium ships for use in the game, as well as collection pieces to use with the Premium ships.

69.     In so doing, Plaintiff wagered his chances and lost value (and Defendant gained at Plaintiff's expense) in Defendant's game of chance because Plaintiff received subjectively, as well as objectively, less desirable items such as temporary camouflage gear.[15]  Thus, Plaintiff did not receive a Premium ship through his purchase of the two loot creates.  Further, on information and belief, Plaintiff received items valued less than the monetary amount paid for the loot crates.

70.     At or around the time of the purchase, Defendant made available loot crates such as the "Always Courageous Premium Containers" that provided the chance to win the USS Oklahoma, a tier V ship.

71.     At the time, Defendant did not inform Plaintiff, nor consumers generally, of the likelihood of receiving various items through the game of chance in purchasing the loot creates, now referred to by Defendant as "drop rates".

72.     As of March 28, 2022, the price to purchase tier VIII ships (for U.S.A ships) is as follows: $37.60 for the Kidd; $45.20 for the Rochester; $42.50 for the Saipan; $47.20 for the Wichita; $45.20 for the Congress; $50 for the Alabama; and $51.20 for the Constellation.[16]

73.     As of April 13, 2022, the most expensive tier V ship (for U.S.A ships) was $44.99 (on sale;

---

[15] Some camouflage gear that is available for purchase is permanent, but it costs substantially more than camouflage gear that is temporary.

[16] https://na.wargaming.net/shop/wows/vehicles/?nation=usa&level=8

1  normally over $56.00).

2  74.    Upon information and belief, a record of the items obtained by Plaintiff through the loot

3  creates is electronically stored by, and known to, Defendant.

4  75.    Plaintiff has ceased playing the online game.

5  76.    Plaintiff also disaffirms any contract with Defendant and related entities as pertaining to

6  the Defendant's online games.

7                                    **CLASS ACTION ALLEGATIONS**

8  77.    **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3)

9  and/or (b)(4) on behalf of himself and a "Class" of similarly situated individuals, defined as

10 follows:

11          All persons in the State of Washington who, while under the age of
12          18, purchased one or more crates, boxes, containers, or a similar
            option to obtain a randomized selection of items or features for
13          World of Warships, World of Tanks, World of Warplanes, World of
            Tanks Blitz, World of Warships Blitz, and/or Master of Orion.
14

15 78.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding

16 over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents,

17 successors, predecessors, and any entity in which the Defendant or its parents have a controlling

18 interest and its current or former employees, officers and directors: (3) persons who properly

19 execute and file a timely request for exclusion from the Class; (4) persons whose claims in this

20 matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel

21 and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such

22 excluded persons.

23 79.    Plaintiffs reserve the right to revise the Class definition based on facts learned in the course

24 of litigating this matter.

25 80.    **Numerosity:** On information and belief, tens of thousands of consumers fall into the

26 definition of the Class. Members of the Class can be identified through Defendant's records,

27 discovery, and other third-party sources.

28 81.    **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendant's wrongful conduct, as detailed herein. Each of Defendant's online games are substantially similar in that they offer a randomized selection of items of features for purchase in a game of chance, and therefore, Plaintiff is typical of all persons under the age of 18 who spent money on a game of chance in any of Defendant's online games, World of Warships, World of Tanks, World of Warplanes, World of Tanks Blitz, World of Warships Blitz, or Master of Orion.

82. **Adequacy:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's guardians have retained experienced and competent counsel in consumer class actions.

83. **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Members of the Class to individually seek redress for the wrongful conduct alleged herein. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action. If class treatment of these claims were not available, Defendant would likely unfairly receive thousands of dollars or more in improper venue.

84. **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff's and the Class' claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

   a. Whether Defendant's naval warship games are "gambling" as defined by RCW § 9.46.0237;

   b. Whether Defendant is the proprietor for whose benefit the online naval warship games are played;

   c. Whether Plaintiff and each member of the Class lost money or anything of value by gambling;

   d. Whether Defendant violated the Washington Consumer Protect Act, RCW §

19.86.010, *et seq.*; and

e.      Whether Defendant has been unjustly enriched as a result of this conduct.

85.      **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief, including but not limited to injunctive relief, to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same or substantially the same.

**FIRST CAUSE OF ACTION**

**VIOLATIONS OF REVISED CODE OF WASHINGTON § 4.24.070**

**(On behalf of Plaintiff and the Class)**

86.      Plaintiff incorporates the foregoing allegations as if fully set forth herein.

87.      Plaintiff, members of the Class, and Defendant are all "persons" as defined by RCW § 9.46.0289.

88.      The State of Washington's "recovery of money lost at gambling" statute, RCW 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

89.      "Gambling," defined by RCW § 9.46.023, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

90.      Defendant's games are illegal gambling games because they are online games at which players wager things of value (e.g., loot crates) and by an element of chance (*e.g.*, purchasing gold

doubloons in exchange to purchase loot crates) are able to obtain additional entertainment and extend or enhance gameplay (by purchasing or potentially obtaining valuable items (such as ships) and feature otherwise not available for purchase or available for purchase at a premium price.)

91.    Defendant is the proprietor for whose benefit its online gambling game because it owns and operates those games for its own profit.

92.    As such, Plaintiff and the Class gambled when they purchased loot crates to wager at Defendant's online gambling naval game. Plaintiff and each member of the Class staked money, in the form of Doubloons purchased with money, at Defendant's games of chance (*e.g.*, Defendant's loot crates) for the chance of winning additional things of value (*e.g.*, coveted naval ships, or assets that extend or enhance gameplay without additional charge).

93.    Defendant's games are not "pinball machine[s] or similar mechanical amusement device[s]" as contemplated by the statute because, among other things, they are electronic rather than mechanical.

94.    Defendant's "loot crates" and the like that are sold for use in Defendant's online war games are "things of value" under RCW § 9.46.0285.  A "[t]hing of value" under that section is defined as "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

95.    Defendant's games are "Contest[s] of chance," as defined by RCW § 9.46.0225 because they are "contest[s], game[s], gaming scheme[s], or gaming device[s], in which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding the skill of the contestants may also be a factor therein."

96.    "Amusement games" are games where "[t]he outcome depends in a material degree upon the skill of the contestant," amongst other requirements. *See* RCW § 9.46.0201.  Defendant's war games are not "Amusement games" because the games are contests of chance, as defined by RCW § 9.46.0225.

97.    As a direct and proximate result of Defendant's gambling game, Plaintiff and each member

of the Class have lost money or things of value wagering at Defendant's games of chance. Plaintiff, on behalf of himself and the Class, seeks an order (1) requiring Defendant to cease the operation of its online gambling game in terms of the offer to sale "loot crates" and similar option of a randomized selection of items of features for purchase in a game of chance; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

### SECOND CAUSE OF ACTION

### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECT ACT, RCW §

### 19.86.010, *et seq.*

### (On behalf of Plaintiff and the Class)

98.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

99.     The Washington's Consumer Protect Act, RCW § 19.86.010, *et seq.* ("CPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

100.    In line with this goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." RCW § 19.86.020.

101.    Under CPA, "a claimant may establish that the act or practice is injurious to the public interest because it … Violates a statute that contains a specific legislative declaration of public interest impact."

102.    Defendant violated RCW § 9.46.010, which declares in part:

> The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.
> It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at

the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace.

103.    Defendant's war games are illegal online gambling games as described above, in violation of RCW § 9.46.010, *et seq.*

104.    Defendant's wrongful conduct occurred in the conduct of trade or commerce—*i.e.*, while Defendant was engaged in the operation of making online computer games available to the public.

105.    Defendant's acts and practices were and are injurious to the public interest because Defendant, in the course of its business, continuously advertised to and solicited the general public in Washington State and throughout the United States to play its unlawful war games of chance. This was part of a pattern or generalized course of conduct on the part of Defendant, and many consumers have been adversely affected by Defendant's conduct and the public, especially minors under the age of 18, are at risk.

106.    Defendant has profited greatly from its operation of unlawful online games of chance, amassing hundreds of millions of dollars from the losers of its games of chance.

107.    As a result of Defendant's conduct, Plaintiff and the Class members were injured in their business or property—*i.e.*, economic injury—in that they lost money wagering on Defendant's unlawful games of chance.

108.    Defendant's unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injury because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on Defendant's games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

109.    Plaintiff, by and through his Guardians Ad Litem, and on behalf of himself and the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

//

//

**THIRD CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(On behalf of Plaintiff and the Class)**

110.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

111.     Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant received for them for the purchase of in-game currency in a game of chance, including in World of Warships, World of Tanks, World of Warplanes, World of Tanks Blitz, World of Warships Blitz, or Master of Orion.

112.     The purchase of the in-game currency such as Doubloons (or using actual fiat), to wager on the loot crates in, for example, Defendant's World of Warships game, is and was beyond the scope of any contractual agreement between Defendant and Plaintiff and members of the Class, especially since Plaintiff and members of the Class were under the age of 18 at the time of the purchases and transactions in the games of chance offered by Defendant.

113.     This is likewise the case for each purchased randomized selection of items of features for purchase in World of Warships, World of Tanks, World of Warplanes, World of Tanks Blitz, World of Warships Blitz, and Master of Orion.

114.     Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

115.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendant has unjustly obtained as a result of its unlawful operation of unlawful online gambling games. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits from minors.

116.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and or wrongful conduct alleged herein from Plaintiff and the Class.

//

//

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

- For an Order certifying the Class and appointing Plaintiff and/or his guardian/s as class representative, and designating Plaintiff's counsel as counsel for the Class;

- For an Order declaring that Defendant's conduct, as detailed above, violates the CPA and RCW 4.24.070;

- Entering judgment against Defendant, in the amount of the losses suffered by Plaintiff and each member of the Class;

- Enjoining Defendant from continuing the challenged conduct;

- Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Class;

- Awarding damages to Plaintiff and the Class members in an amount to be determined at trial, including trebling as appropriate;

- Awarding restitution to Plaintiff and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendant unjustly received;

- Costs of suit;

- Awarding reasonable attorney's fees, pursuant to, *inter alia*, the common fund doctrine;

- Awarding pre- and post-judgment interest, to the extent allowable; and

- Awarding such other and further relief as equity and justice require.

//
//
//
//
//
//
//

**DEMAND FOR TRIAL BY JURY**

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

Dated: April 26, 2022                            Respectfully submitted,

                                              **KAZEROUNI LAW GROUP, APC**

                                      By: /s/ Abbas Kazeronian
                                              Abbas Kazerounian, Esq.
                                              WA BAR NO. 48522
                                              5608 17TH AVENUE NW, #891
                                              SEATTLE, WAS 98107
                                              PHONE: 800-778-2065
                                              FAX: 800-520-5523
                                              *ATTORNEY FOR PLAINTIFF*

**Additional Counsel for Plaintiff**
**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq.
(*Pro Hac Vice* Application Forthcoming)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, UT 84790
Telephone: (800) 400-6808
Facsimile: (800) 520-5523